UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISAINA

| | |
|---|---|
| **STEPHEN H. RUGG and PATRICIAL RUGG** | **CIVIL ACTION NO.: 3:09-cv-01952** |
| Plaintiffs | |
| **VERSUS** | **SECTION** |
| **DAN DAVIS, MATTHEW DAVID GIBSON,** | **JUDGE ROBERT G. JAMES** |
| **JEROME RICHARD SKOW, STRATEGIC** | |
| **ADVISERS, INC., FIDELITY BROKERAGE** | **MAGISTRATE JUDGE KAREN** |
| **SERVICES, L.L.C., and FMR, L.L.C.** | **HAYES** |
| Defendants | |

---

## SUPPLEMENTAL, AMENDING, AND RESTATED PETITION FOR DAMAGES

---

NOW INTO COURT, through undersigned counsel, come Plaintiffs, STEPHEN H.

RUGG and PATRICIA A. RUGG, husband and wife and persons of a full age and majority and

residents of this parish and state, whose Supplemental, Amended, and Restated Petition for

Damages avers as follows:

1.

Defendants are:

DAN DAVIS, a resident of the state of Texas and at times pertinent hereto and currently an employee of Strategic Advisers, Inc, who may be served through his attorney of record ("Davis").

MATTHEW DAVID GIBSON, a resident of the state of Texas and at times pertinent hereto an employee of Fidelity Brokerage Services, LLC and Strategic Advisors, Inc. and currently an employee of Strategic Advisers, Inc., who may be served through his attorney of record (Gibson").

JEROME RICHARD SKOW, a resident of the state of Texas and at times pertinent hereto and currently an employee of Strategic Advisers, Inc., who may be served through his attorney of record ("Skow").

STRATEGIC ADVISERS, INC., a foreign corporation which may be served through its attorneys of record ("SAI").

FIDELITY BROKERAGE SERVICES, L.L.C., a foreign corporation which may be served through through the Long Arm Statute ("FBS").

1

FMR, L.L.C., a foreign corporation which may be served through the Long Arm Statute ("FMR").

## FACTS

2.

Upon information and belief, FMR is a foreign holding company which wholly owns defendants, SAI and FBS, as well as non-defendant but affiliated companies, National Financial Services, LLC ("NFS") and Fidelity Management & Research Company ("Fidelity Management").

3.

SAI provides investment advisory services to individuals.

4.

Marketing literature prepared, published, and disseminated to the public by SAI and/or FMR represents that to retain SAI's services, customers must open an account with NFS which SAI describes as an "affiliate.

5.

That same marketing literature represents that SAI will consult with Fidelity Management, as the investment manager of Fidelity Funds, for investment strategies and that SAI is a "Fidelity Investments Company" with numerous corporate and business affiliations with other Fidelity companies and prominently displays the Fidelity Investment's brand and/or trademark.

6.

FMR, FBS, and SAI operate as a single business enterprise with shared employees, marketing literature, and clients.

2

7.

Upon information and belief, FBS employed defendant Gibson at times pertinent hereto.

8.

Upon information and belief, SAI employed Gibson at times pertinent hereto.

9.

At times pertinent hereto, FBS also employed Anthony Gioco ("Gioco").

10.

At times pertinent hereto, SAI also employed Gioco.

11.

At times pertinent hereto, FBS employed Skow.

12.

At times pertinent hereto, SAI also employed Skow.

13.

At times pertinent hereto, FBS employed Davis.

14.

At times pertinent hereto, SAI also employed Davis.

15.

Mr. Rugg had been a long-time employee of Ford, Bacon & Davis, L.L.C. and, prior to 2001, had accumulated significant investments and retirement portfolios.

16.

At times pertinent hereto Mrs. Rugg was a long-time employee of the University of Louisiana at Monroe and, prior to 2001, had also accumulated significant investment and retirement portfolios.

17.

Both Mr. and Mrs. Rugg had brokerage contracts and agreements with FBS for the management of their portfolios.

18.

Upon information and belief, because FBS and SAI operated as a single business enterprise, the Ruggs' confidential investment and financial information was shared between the two companies.

19

In January of 2001, Gioco, holding himself out as employee of FBS, contacted Mr. and Mrs. Rugg regarding their joint investment and their individual retirement accounts which were then self-directed.

20.

Unknown to Plaintiffs at the time, Gioco was a shared employee of SAI.

21.

Gioco subsequently introduced the Plaintiffs to Gibson who held himself out as a SAI employee and representative.

22.

Unknown to Plaintiffs, Gibson was a shared employee of FBS and registered as an agent of same.

23.

During initial discussions, Gioco claimed that the proprietary advisory services offered by SAI had only lost 12% of their managed accounts by using asset allocating techniques and that stock percentage allocations were to be reduced five years prior to retirement.

4

24.

Because of their losses in the market (which plaintiffs partially attributed to the fact they self directed the funds and due to their lack of time and skill required to devote to market research and trading), Gibson and Gioco recommended the Ruggs transfer their FBS accounts to SAI's Portfolio Advisory Services ( "PAS account") to be managed by SAI.

25.

At the time of first contact with SAI, Mr. Rugg was fifty-five and Mrs. Rugg was fifty-four.

26.

Gibson, representing himself as a SAI agent, represented that investment advisor services would be provided by SAI through a Relationship Officer ("RO") who was to be a Registered Investment Adviser Representative.

27.

At that time, Gibson and/or also represented that SAI, through its employees and agents, would closely monitor and manage the PAS accounts, conduct regular and timely asset allocation evaluations, and make the needed adjustments to those allocations given Ruggs' financial situation, age, and expected retirement dates.

28.

Gibson and/or Gioco committed to make changes to the Ruggs' portfolios as necessary to maintain the appropriate risk adjusted asset allocations to achieve Mr. Rugg's stated retirement date of February 2011 and anticipated withdraw of account funds.

29.

Gibson and/or further represented that SAI's RO would consult with a SAI investment management team annually to determine if changes in the portfolios were necessary.

30.

The literature provided by Gioco, Gibson, and SAI <u>prior</u> to any transfer of funds to SAI's PAS accounts provided the typical managed portfolio would include up to 70% stock allocations for person in their fifties and that a retired couple in their early sixties would have their stock allocations reduced to 20%.

31.

After numerous discussions with Gibson and Gioco and upon receipt and review of the SAI literature outlined above and upon the representations contained therein, in February of 2001 the Ruggs agreed to transfer their individual and retirement accounts from FBS to PAS accounts managed by SAI and administered by NFS and a Fidelity Funds Manager Program Customer Agreement was then issued and executed ("Agreement").

32.

Plaintiffs were then informed that their relationship officer with SAI would be Davis.

33.

Davis contacted the Plaintiffs and identified himself as their RO.  He also forwarded an Agreement Package, an introductory letter, and fact card that stated, "Mr. Davis is a Registered Investment Adviser Representative of Strategic Advisers, Inc., licensed to conduct business in your state".

34.

Davis acted as the SAI RO for Plaintiffs from February 2001 to April 1, 2006.

35.

Upon information and belief, at the time of first contact with Davis until Davis ceased acting as the Ruggs' RO and contrary to his express representations, Davis was not registered as an investment advisor representative in Louisiana.

36.

After April 1, 2006 Skow took over responsibility as the Ruggs' RO.

37.

Upon information and belief, Skow was never registered as an investment advisor representative in Louisiana.

38

SAI, through its marketing literature, Agreement, Agreement Package, and agents, and the individual Defendants, while each were in contact with Plaintiffs and/or acting as their RO, committed to make changes to the Ruggs' portfolios as necessary to maintain the appropriate risk-adjusted asset allocations to achieve Mr. Rugg's stated retirement date of February 2011.

39.

SAI, through its marketing literature, Agreement, Agreement Package, and its agents,  and the individual Defendants, while each were in contact with Plaintiffs and/or acting as their RO, committed to make investment decisions and  allocation changes based upon Investor Profile Questionnaire("IPQ"), interim information provided by Plaintiffs by other means,  and stated retirement dates.

40.

SAI, through its marketing literature, Agreement, Agreement Package, and its agents, and  the individual Defendants, while each were in contact with Plaintiffs and/or acting as their RO,  committed to change  allocations and investment strategies in the manner prescribed in SAI's marketing literature, Agreement, and Agreement Package based upon changes in data of the Ruggs' IPQ.

41.

SAI, through its marketing literature, Agreement, Agreement Package, and its agents, and the individual Defendants, while each were in contact with Plaintiffs and/or acting as their RO, committed to consult with SAI's Investment Management Team ("IMT") annually and determine if a change in the portfolio allocation is appropriate.

42.

SAI, through its employees, agents, and the individual Defendants, never made changes in the Ruggs' PAS accounts for risk reduction as represented but rather SAI and each subsequent RO maintained a 70% stock allocation for all Rugg accounts from inception in 2001 until the accounts were closed in November 2008.

43.

During telephone conversations beginning in 2005 with Davis and Skow, Mr. Rugg questioned when the stock percentage allocation would be reduced as promised during the pre-agreement discussions and as provided in the Agreement or the Agreement Package. Davis and Skow always replied that it was not time to reduce the percentage of stock.

44.

During a May 22, 2008 telephone conversation between Mr. Rugg and Skow, Mr. Rugg advised of health problems and the need to take immediate retirement. Skow replied that an allocation change was not appropriate and did not take into consideration Mr. Rugg's questions and/or change in status nor did he consult the IMT.

45.

SAI, through its employees, and agents, and the individual Defendants, acted grossly negligent and in  wanton disregard of Plaintiffs' interests and in breach of applicable laws and regulations for  account Y98067490 ( the Ruggs' joint account) in the following non-exclusive particulars:

> (a) Although the initial IPQ investment recommendation was prepared on January 17, 2001, there was a lapse of 408 days before Davis submitted a letter, which stated that a review with the IMT had determined that no changes were necessary to the Rugg portfolio strategy.
>
> (b) This review was 43 days late.
>
> (c) However, a copy of a written Annual Strategic Review ("ASR") was not received as represented and required under the marketing literature, Agreement, and Agreement Package.
>
> (d) On January 2, 2003, Davis submitted a letter with a current IPQ for review by the Ruggs. The Ruggs then discussed with Davis.
>
> (e) After the January 2, 2003 IPQ and subsequent discussion with Davis, the Ruggs never received a written ASR.
>
> (f) After the subsequent change to Skow as the RO, there was never an updated IPQ, any written questions submitted for answers, or a written ASR.
>
> (g) Contrary to Skow's subsequent communications in November of 2008 that previous letters were sent with new questions and due to lack of answers from the Ruggs, Defendants would continue to manage the portfolios based on the existing data, the Ruggs did not receive any letters requesting information for the PAS accounts.
>
> (h) There is was a lapse of 2146 days between the last annual review and the date the relationship was terminated.

46.

SAI, through its employees, and agents, and the individual Defendants, acted grossly negligent and in wanton disregard of Plaintiffs' interest and in breach of applicable laws and regulations for account Y99516775 (Mrs. Rugg's Retirement Account) in the following non-exclusive particulars:

(a)   Although the initial IPQ investment recommendation was prepared on January 22, 2001, there was a lapse of 710 days before Davis submitted a letter on January 2, 2003, which stated that a review with the IMT had determined that no changes were necessary to the Ruggs' portfolio strategy.

(b)   This review was to be performed annually but was 345 days late.

(c)   A written ASR was never received as stipulated in the marketing literature, Agreement, and Agreement Package.

(d)   After the January 2, 2003 communication from Davis, there was a lapse of 1411 days until Skow submitted a cover letter on November 13, 2006 which stated that he and the IMT had completed the ASR and that a change was not necessary.

(e) A copy of the written ASR was never received as stipulated in marketing literature, Agreement, and Agreement Package.

(f)   After the November 13, 2006 communication from Skow there was a lapse of 388 days until Skow submitted a cover letter on December 6, 2007 which stated that he and the IMT had completed the ASR and a change was not necessary.

(g) A copy of the written ASR was never received as required in the in the marketing literature, Agreement, and Agreement Package.

(h)   Contrary to Skow's November 13, 2008, letter that previous letters were sent with new questions and due to lack of answers from Rugg, Defendants would continue to manage the portfolios based on the existing data, Plaintiffs did not receive any letter requesting additional information for the PAS accounts.

47.

SAI, through its employees, and agents, and the individual Defendants, acted grossly negligent and in wanton disregard for Plaintiffs' interest and in breach of applicable laws and regulations for account Y99515523 (Mr. Rugg's Retirement Account) in the following non-exclusive particulars:

(a)   Although the initial IPQ investment recommendation was prepared on January 22, 2001, there was a lapse of 710 days before Davis submitted a letter on January 2, 2003, which stated that a review with the IMT had determined that no changes were necessary to the Rugg portfolio strategy.

(b)   This review was to be done annually as previously represented but was 345 days late.

10

(c)     A written ASR was never received as required in the in the marketing literature, Agreement, and Agreement Package.

(d)     After the January 2, 2003 communication from Davis, there was a lapse of 1411 days until Skow submitted a cover letter in November, 2006 which stated that he and the IMT had completed the ASR and a change was not necessary.

(e) A copy of the written ASR was never received as required in the in the marketing literature, Agreement, and Agreement Package.

(f) After the November 13, 2006 communication from Skow, there was never an updated IPQ, any written questions submitted for answers, or a written ASR as required in the in the marketing literature, Agreement, and Agreement Package.

(g)     735 days elapsed without any further efforts by Skow to manage this account until the relationship and agreement was terminated.

(h)     On November 13, 2008, Skow simply communicated by letter that previous letters were sent with new questions and due to lack of answers from Rugg, Defendants would continue to manage the portfolios based on the existing data. However no management or advisory services were rendered.

(i)     However, Rugg did not receive any letter requesting information for the PAS accounts.

48.

For all accounts, an average of more than 3.48 years lapsed between each updated IPQ and discussions.

49.

Upon information and belief, SAI did not have procedures and protocols in place to assure timely and meaningful reviews,  timely advice, and delivery of complex  financial management services to the Ruggs all in gross and wanton disregard of the representations made in the in the marketing literature, Agreement, and Agreement Package and in their financial interests.

50.

Additionally, SAI, through its employees, and agents, and the individual Defendants, continuously failed to execute services pursuant to SAI's procedures and protocols and in compliance with assurances and representations in wanton disregard for the interests of the Ruggs and with certain knowledge that the dilatory manner in which the Ruggs' accounts were managed would result in damages due to the high stock allocation.

RESCISSION/NULLITY

51.

Plaintiffs reiterate hereunder all allegations set forth above.

52.

Plaintiffs show that the Agreement between the parties should be rescinded under state law, pursuant to LSA-C.C. Art. 1948, *et seq*.; as, Plaintiffs were in error as to the status and abilities of SAI to perform the represented services in Louisiana.

53.

Plaintiffs show that the agreements between the parties are null under state law pursuant to LSA-C.C. Art. 2029, *et seq*.; as, for reasons more fully set forth above and below, Defendants violated rules of public order and/or they violated a rule intended for the protection of a private party

54.

Additionally, SAI and the individual Defendants abject failure to execute the services for the Ruggs in disregard for their financial interest as required in the marketing literature, Agreement, and Agreement Package requires a rescission of the Agreements between the parties pursuant to state law.

12

55.

Upon information and belief in January of 2001, FBS and SAI used confidential information from the Ruggs' FBS brokerage accounts to single out the Ruggs as candidates for purchasing PAS accounts and entering into agreements with SAI.

56.

During pre-agreement discussions with the Ruggs, SAI, through its agents and employees and the individual Defendants, misrepresented the registration status of Davis and Skow.

57.

Upon information and belief, SAI failed to establish procedures and protocols required to meet its obligations set forth in its marketing literature, Agreement, and Agreement Package or, in the alternative, failed to follow those procedures or protocols as required by 17CFR 275.206.

58.

FBS and/or SAI and the individual Defendants failed to disclose the dual employment of certain employees, including but not limited to Gibson and Gioco.

59.

Specifically, at the time of solicitation, Gioco was an employee of both FBS and SAI and was registered as a FBS AG in Louisiana.  However he was an undisclosed SAI employee at the time he solicited the Ruggs' account to SAI  in violation of 17 CFR 275.206.

60.

SAI published misleading marketing literature by disseminating the Efficient Frontier Curve which overstated the expected rate of return on the Ruggs' PAS accounts in violation 37 CFR 206.

61.

FBS, SAI, and the individual Defendants' acts and omissions, as outlined above, constitute violations of the Investment Advisors Act of 1940 which renders the Agreement between the parties voidable and null pursuant to 17 CFR 275.215.

62.

As such, the parties should be placed in the position they enjoyed prior to the agreements subject to this petition and Defendants ordered to return of all amounts funded by Plaintiffs and management fees paid to date as more fully described below, plus judicial interest and/or loss of earning potential from the date of inception of the subject accounts.

BREACH OF CONTRACT

63.

Plaintiffs reiterate hereunder all allegations set forth above.

64.

SAI, through its employees and agents, breaches of the Agreement as outlined above have caused damages to Plaintiffs as plead below.

DETRIMENTAL RELIANCE

65.

Plaintiffs reiterate hereunder all allegations set forth above.

66.

Based upon SAI and the individual Defendants' representations, Plaintiffs changed their position by establishing and maintaining the subject PAS accounts to their detriment. But for said representations, the Ruggs would not have done so.

67.

SAI and the individual Defendants' statements, representations, acts, and omissions are actionable under a theory of detrimental reliance.

## BREACH OF FIDUCIARY DUTY

68.

Plaintiffs reiterate hereunder all allegations set forth above.

69.

The individual Defendants and SAI are required to exercise a very high level of fiduciary duty to Plaintiffs. Defendants are required to establish, maintain and enforce a code of ethics, which require that 1) business conduct must reflect the fiduciary obligations of the Act, 2) supervised persons comply with Federal securities laws, 3) supervised persons must receive and acknowledge the code of ethics, and 4) violation reports and holdings reports must be provided. See 17 CFR 275.206(4)-7.

70.

SAI and the individual Defendants were in a position of trust and owed Plaintiffs a good faith duty to timely and appropriately discharge their obligations.

71.

SAI and the individual Defendants' acts and omissions, described above, breached Plaintiffs' trust, constituted a breach fiduciary duty, and caused Plaintiffs damages as described below.

## NEGLIGENCE/GROSS NEGLIGENCE

72.

Plaintiffs reiterate hereunder all allegations set forth above.

73.

SAI and the individual Defendants' acts and omissions plead above were the result of SAI and the individual Defendants gross and wanton disregard of the interest of the Ruggs which caused certain and foreseeable harm and damages set forth below.

## BREACH OF STATE LAW

74.

Plaintiffs reiterate hereunder all allegations set forth above.

75.

Upon information and belief, Skow was not registered in the state of Louisiana as required under LSA-R.S. 51:703.

## FBS AND FMR LIABILITY

76.

FBS is vicariously liable for the acts and omissions of its employees.

77.

FBS and FMR are liable for the acts and omissions of SAI as they constitute a single business enterprise.

## DAMAGES/RELIEF

78.

Plaintiffs therefore seek a rescission of the subject Agreements or, in the alternative, a declaration of the nullity of the Agreements for the reasons set forth above.

79.

Plaintiffs' are therefore entitled to the recovery of all the initial investments totaling One Million, Four Hundred Sixty-six Thousand, One and 90/100 ($1,466,001.90) Dollars and management fees of Seventy-six Thousand, Seven Hundred Ten and 68/100 ($76,710.68) Dollars for a total of One Million, Five Hundred Forty-two Thousand, Seven Hundred Twelve and 58/100 ($1,542,712.58) Dollars less amounts withdrawn of One Million, One Hundred Forty-four Thousand, One Hundred Twenty and no/100 ($1,144,121.00) Dollars totaling Three Hundred Ninety-eight Thousand, Five Hundred Ninety-one and 58/100 ($398,591.58) Dollars .

80.

Plaintiffs show that they have been deprived of any opportunity to enjoy a return on their investment which, based upon Louisiana judicial interest, exceeds One Million, Three Hundred Eighty-three Thousand and 59/100 ($1,383,000.59) Dollars.

81.

In the alternative, Plaintiffs show that they have been damaged as a result of Defendants' misrepresentations, breach of contract, breach of fiduciary duty, and/or gross negligence as follows:

Plaintiffs were damaged by Defendants' failure to reallocate as described above.   If Defendants had reallocated as required by their internal guidelines, Plaintiffs' losses would have been minimal and/or Plaintiffs would have enjoyed a positive return on their investments of up to Five Eighty-one Thousand, Fifty-seven and no/100 ($581,057.00) Dollars.

82.

The Ruggs further show that they have paid significant management fees to SAI since 2001. Since the date inception through the date of the accounts was closed, the Ruggs have paid

Seventy-six Thousand, Seven Hundred Ten and 68/100 ($76,710.68) Dollars in management fees.

83.

Due to Defendants' acts and/or omissions as described above, the Ruggs are entitled to a return of the management fees of Seventy-six Thousand, Seven Hundred Ten and 68/100 ($76,710.68) Dollars and the loss of returns that would have been enjoyed but for defendants' acts and omissions more fully described above.

WHEREFORE, Plaintiffs pray that their Supplemental, Amending, and Restated Petition be deemed good and sufficient and that, after due proceedings are had, there be judgment in their favor and against Defendants, casting Defendants in judgment, in solido, for all damages, costs, including attorneys' fees as allowed by law, and as are reasonable under the premises.

Respectfully Submitted

McNEW, KING, MILLS, BURCH & LANDRY, L.L.P.
2400 Forsythe Avenue, Suite 2
Monroe, Louisiana  71201
Phone:       (318) 361-3140
Facsimile:   (318) 361-3141
Email:       bking@mkmblaw.com


/s/ Brady D. King, II
BRADY D. KING, II    #18288
ATTORNEYS FOR STEPEHN H. RUGG. and
PATRICIA A. RUGG

## CERTIFICATE

I, **BRADY D. KING, II**, HEREBY CERTIFY that a copy of the above and foregoing has been served on all counsel of record by facsimile, electronic mail or by placing a copy of same in the United States Mail, properly addressed and with adequate postage affixed thereon to:

Meredith A. Cunningham     David C Boch
Attorney at Law     Michael R. Weissman
909 Poydras St. Suite 2400     Michael C. Moran
New Orleans, LA 70112     Bingham McCutchen, L.L.P.
    One Federal Street
    Boston, MA 02110-1726

Monroe, Louisiana, this 8th day of February, 2010.

/s/ Brady D. King, II
OF COUNSEL